## IN THE COURT OF APPEALS OF TENNESSEE, WESTERN SECTION
## AT JACKSON

_____

| | | |
|---|---|---|
| | ) | |
| **ROBERT J. McCURLEY**, | ) | Madison County Circuit Court |
| **PATRICIA G. McCURLEY**, | ) | No. C93-245 |
| | ) | |
| Plaintiffs/Appellees. | ) | |
| | ) | |
| VS. | ) | C.A. No. 02A01-9703-CV-00059 |
| | ) | |
| **CITY OF JACKSON, TENNESSEE;** | ) | |
| **CHARLES FARMER, Mayor for the** | ) | |
| **City of Jackson, Tennessee; and J. B.** | ) | |
| **GLASSMAN and wife, BRENDA** | ) | |
| **GLASSMAN**, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| **And** | ) | |
| | ) | |
| **HAROLD ANGUS,** | ) | |
| | ) | |
| Defendant/Appellant. | ) | |

**FILED**

**January 9, 1998**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

_____

From the Circuit Court of Madison County at Jackson.
**Honorable Whit Lafon, Judge**

**Phillip L. Davidson,** Nashville, Tennessee
Attorney for Defendant/Appellant Harold Angus.

**Jesse H. Ford, III**, Jackson, Tennessee
**John Van den Bosch, Jr.**, Jackson, Tennessee
Attorney for Plaintiffs/Appellees.

OPINION FILED:

**REVERSED AND REMANDED**

**FARMER, J.**

**CRAWFORD, P.J., W.S.**: (Concurs)
**HIGHERS, J.**: (Concurs)

This is an action in negligence arising out of the June 1993 acts of the appellant, Harold Angus, in demolishing the "Glassman" building, located at 111 North Highland Avenue in Jackson, pursuant to a contract with the city. Angus' demolition of the building, which had been declared condemned by the city code, is not disputed. Nor is it disputed that, as a result of the building's demolition, damage was sustained to the building located adjacent thereto, identified as the "Carmen's" building, and owned by the appellees, Robert J. McCurley and wife, Patricia G. McCurley.[1] The two buildings shared a common "party wall." At issue in this case is whether Angus was negligent in its demolition of the Glassman building so as to be held legally accountable to the McCurleys for the damages they sustained. The case proceeded to a trial by jury where, at the close of all proof, the trial court directed a verdict in favor of the appellees on the issue of liability.[2] Angus has appealed challenging the correctness of the trial judge's decision in this regard. For the reasons hereinafter stated, we reverse and remand for a new trial.

The following evidence was presented: Robert McCurley operated the business of "Carmen's," a clothing store, from 1977 to 1995. The building contained 12,000 square feet and covered three floors. In 1993, prior to the Glassman demolition, McCurley became concerned about the safety of his building. He testified that both Angus and the city building inspector, Mr. Hicks, informed him that the demolition would not affect his building, with Hicks commenting to him that he had "a safe building and not to worry about it, . . . ." McCurley observed Angus demolish the Glassman building with "bulldozers . . . and pull [it] down." This resulted in the north wall and roof of Carmen's being torn away. Although McCurley is not an "expert in demolition," he believes that there was "something wrong with using a bulldozer to take down a wall, . . . ."

The court questioned McCurley as follows:

THE COURT:     . . . In this process, was your - - was your

---

[1]The McCurleys originally filed suit against the City of Jackson, Tennessee, Charles Farmer, city mayor, and J. B. and Brenda Glassman also. The action as to these defendants was dismissed on motions for summary judgment. Various other cross-claims and counter-complaints were filed by the respective defendants which have now either been dismissed with prejudice or voluntarily non-suited.

[2]This was the only issue confronting the jury. The parties stipulated to damages at the beginning of trial in the amount of $485,000, should liability be determined.

wall damaged?

MR. MCCURLEY: Yes.

THE COURT: . . . Who did the damage to your wall?

MR. MCCURLEY: Mr. Angus did.

THE COURT: Anybody except his employees and him?

MR. MCCURLEY: That's all.

Lynn Hicks, the director of the City Building and Housing Codes Department at the time, explained that the Carmen and Glassman buildings were built property line to property line and shared a party wall, "a common wall between the two buildings at the property line." He testified that he was concerned with the possible effect the demolition might have on the adjacent (Carmen's) building. He discussed the "method" of demolition with Angus, considering the party wall between the two buildings, and his concern that they might come down in a "domino effect" or create "some kind of uncontrolled collapse." Angus expressed the same concerns.

Hicks believed it was Angus's "intention" to tear the Glassman down "piece-by-piece" or "joist-by joist" as opposed to demolishing it all at once. Hicks testified that "initially" Angus took the building down "stick by stick," beginning with the roof. The second floor, however, came down "in one piece." He stated that Angus informed him that a dozer was attached to the north wall which was pulled down resulting in the collapse of the second floor. Hicks does not consider Angus' method of demolition "acceptable."

On cross-examination, Hicks said that properly Angus should have taken the joist on the second floor apart piece-by-piece. Hicks stated that no one, not even Angus, knew for certain exactly how the two buildings were attached until they started coming apart. He further testified:

Q.     At the time that he was demolishing the building, he did not know that what he was doing would cause any damages to the McCurleys, did he?

A.     He was aware, and I was aware, that there would have to be some work done to that wall on the second floor. And the reason for that is we both recognized that that was an interior wall. And once we moved the Glassman Building, he was basically left with a structure as a second floor wall that was an interior wall. So, he was

aware that it would take some weatherproofing to make the building safe.

. . . .

A.       . . . . it was not the intention to take the wall down. It was a wall that was shared by both buildings. It was on the property line. It was a wood wall that set on a masonry wall that's right on the property line between the Glassman Building and Carmen's. And that wall should not have come out. . . .

Q.       And it's your testimony today that Mr. Angus knew that by pulling that wall down, that this part of the [Glassman] Building that was connected to the McCurley building would pull part of his wall -- the McCurley building wall out; is that what you're saying, that he knew when he did that it was going to happen?

A.       I don't think he knew it.

Q.       And you didn't either, did you?

A.       No, sir.

. . . .

Q.       Did you ever express any concerns to Mr. Angus during the . . . destruction of this building if he was doing anything wrong?

A.       No, sir.

Hicks acknowledged that, if the building was an unsafe structure, then taking it apart in the manner suggested (piece-by-piece) would have placed Angus and his crew in "some degree" of danger.

Emison Hockett testified that he is in the construction business and familiar with demolition work involving party walls. Hockett stated that he had, prior to the demolition, examined the Glassman and Carmen buildings and was aware of a common "party" wall. He explained that many of these type buildings, built 75 to 100 years ago, share party walls and "come up with a brick wall . . . from the basement area all the way up." From two stories up, there is wood framing on top of the brick and then a roof. He continued, "if you don't go in and examine the buildings, [you think] that you've got a whole complete brick wall. But in those old buildings, . . . they allowed them to put wood on top of the bricks so far down. So, if you don't go in and examine them . . . you could get into a lot of problems."

With regard to the type of construction of the two buildings in question, Hockett stated that proper demolition usually involves constructing a block wall along side the fragile (brick)

wall all the way up to the wood.  The proper means, according to Hockett, would be to "[t]ear it down brick-by-brick by hand and build that party wall . . . Most cities that I work for, they demand that you do that.  They make codes for it."  Hockett testified that the destruction of the Carmen building was caused by Angus' method of demolition, which he believes unacceptable, considering the party wall.  Hockett declared that he would have taken the building down piece-by-piece even if the structure was unstable.

Glenn Mutters, an engineer, testified that "[t]he demolition of the party wall was caused by the cantilever action of knocking out an adjacent wall."  The floor and ceiling joists were embedded below the party wall, in the masonry wall.  When the adjacent wall was demolished, the joists dropped down and the cantilever action "pried the upper wall out of the Carmen's Building."  Mutters, too, believed the method of demolition utilized by Angus improper.  The proper procedure would have been to utilize a chain saw to cut the floor joists and separate the entire floor system of the Carmen's Building.  If this method had been employed, Mutters believes the "collateral damage" to Carmen's could have been avoided.  On cross-examination, Mutters stated that the actual method of demolition employed by Angus was not at fault, but the fact that the joist system was not first cut free from the party wall. The latter created the damage to Carmen's.

Angus testified that he has been in the demolition business for 25 to 30 years.  He stated that the buildings were connected by the same roof and they "had to cut the top."  He described the Glassman Building as unsafe and that the wall was already about to fall.  He stated, "[w]e couldn't work on it."  He informed McCurley and Hicks of the wall's condition.  Angus stated that there was no other way to take the wall down and that some of the other means suggested would not work because of the building's instability and his crew's inability to be there safely.  Angus stated that he informed McCurley prior to the demolition that part of his top wall was going to come out and that McCurley was "worried" about who would be responsible for repairing it.

Angus further testified:

Q.      . . . But [McCurley] was fully warned that this would happen
because of the condition of [Glassman] and because of the roof
connected . . . and the brick wall didn't go up and this was the only

way you could do it?

A.   That's the only way. . . .

Q.   It was because of the way this building was constructed?

A.   Yes, sir.

On cross-examination, Angus stated that he brought the building down, "the best way we [could]." He took into consideration the safety of his crew. Angus admitted that he did not build a support concrete block wall as Hockett suggested because of financial concerns, but stated, "[w]e didn't contract that[]" and that he had not contracted "to put . . . more walls in." Angus further explained that he did not first separate the second floors of the two buildings because "[i]t had already [fallen] . . . where the wall [had] pulled out" before he even began any demolition work. Angus remarked that once past the brick wall, there is no party wall and the building shared "the same wall." Thus, taking the wall down would necessarily involve taking the Carmen's wall down too. Angus states that McCurley was aware of this prior to demolition and was also made aware that the piece-by-piece method would not work because of the instability of the building. Angus clarified that he did not damage the brick part of the party wall and the wall above that was "just a [two-by-four] run . . . over on [Glassman's building]. That's why it had to come out."

In ruling from the bench, the court indicated that the proof had not shown that anyone other than Angus "did this damage." It was Angus' position, however, that merely causing damage does not necessarily equate to negligence and legal liability. The court proceeded to find Angus negligent as a matter of law and directed a verdict in Appellees' favor. In accordance with the parties' stipulation, the judgment awarded $485,000 to the McCurleys.

The sole issue on appeal is whether the trial court erred in directing a verdict in favor of the appellees. When deciding a directed verdict motion, both the trial court and this Court must look to all the evidence, take the strongest legitimate view of the evidence in favor of the motion's opponent, allow all reasonable inferences in favor of that party and discard all countervailing evidence. If there is then any dispute as to any material fact, or any doubt as to the conclusions to be drawn from the whole evidence, the motion must be denied. *Hurley v. Tennessee Farmers Mut. Ins. Co.*, 922 S.W.2d 887, 891 (Tenn. App. 1995).

The record clearly indicates controverted testimony on the issue of whether Angus was negligent in causing damage to the McCurleys' building due to his method of demolition of the Glassman building. Clearly, there is evidence to suggest that alternative methods were available to avert the damage to Carmen's, if the testimonies of the witnesses testifying on behalf of the McCurley's are considered credible. However, if Angus' testimony is to be believed then no other demolition method existed as to the particular structure and the safety of his crew was at issue.

Our review of the trial court's findings of fact are *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates otherwise. Rule 13(d) T.R.A.P. While we certainly agree with the trial judge that the damage sustained to the Carmen's building resulted directly from the demolition of the Glassman structure, we hold that it is for a jury to determine whether Angus acted negligently in demolishing the one structure so as to cause damage to the other. We believe that reasonable minds could differ on the issue of whether Angus employed the improper method of demolition, negligently causing damage to the McCurleys' building or whether under the particular circumstances at hand, Angus employed the only means available, rendering the resulting damage unavoidable, and of which Mr. McCurley was aware.

It results that the judgment of the trial court is reversed and this cause remanded to the trial court for a new trial on the merits. Costs are assessed against the appellees, for which execution may issue if necessary.

_____
FARMER, J.

_____
CRAWFORD, P.J., W.S. (Concurs)

_____
HIGHERS, J. (Concurs)